IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

AMBER RUSSELL-HARVEY,                    :
                                         :
        Plaintiff                        :
                                         :
    v.                                   :        3:12-CV-00953
                                         :
CAROLYN W. COLVIN, ACTING                :        (JUDGE MARIANI)
COMMISSIONER OF SOCIAL                   :
SECURITY,                                :
                                         :
        Defendant                        :

**FILED
SCRANTON**

**MAY 29 2014**

PER _____

DEPUTY CLERK

## **MEMORANDUM**

## Introduction

        Plaintiff Amber Russell-Harvey has filed this action seeking review of a decision of

the Commissioner of Social Security ("Commissioner") denying Russell-Harvey's claim for

social security disability insurance benefits and supplemental security income benefits.

        Disability insurance benefits are paid to an individual if that individual is disabled and

"insured," that is, the individual has worked long enough and paid social security taxes.  The

last date that a claimant meets the requirements of being insured is commonly referred to

as the "date last insured."  It is undisputed that Russell-Harvey met the insured status

requirements of the Social Security Act through December 31, 2013.  Tr. 15.  In order to

establish entitlement to disability insurance benefits Russell-Harvey was required to

establish that she suffered from a disability on or before that date.  42 U.S.C. § 423(a)(1)(A),

(c)(1)(B); 20 C.F.R. §404.131(a)(2008); *see Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Russell-Harvey protectively[1] filed her applications for supplemental security income benefits and for disability insurance benefits on October 16, 2009. Tr. 13. Russell-Harvey claims that she became disabled on October 1, 2009. *Id.* Russell-Harvey has been diagnosed with several impairments, including cephalgia syndrome,[2] obsessive compulsive disorder, Bipolar II disorder, polysubstance abuse, status post nodal marginal zone lymphoma, status post right radical vulvectomy, and a wide local excision of the right vulva. Tr. 16-17, 366. On April 20, 2010, Russell-Harvey's applications were initially denied by the Bureau of Disability Determination. Tr. 81, 86.

On June 18, 2010, Russell-Harvey requested a hearing before an administrative law judge ("ALJ"). Tr. 93-94. The ALJ conducted a hearing on May 4, 2011, where Russell-Harvey was represented by counsel. Tr. 27-54. On July 27, 2011, the ALJ issued a decision denying Russell-Harvey's application. Tr. 13-22. On March 22, 2012, the Appeals

---

[1] Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2] This is commonly referred to in the administrative record simply as migraines or headaches.

Council declined to grant review.  Tr. 1.  Russell-Harvey filed a complaint before this Court

on May 21, 2012.   Supporting and opposing briefs were submitted and this case became

ripe for disposition on December 3, 2012, when Russell-Harvey filed a reply brief.

Russell-Harvey appeals the ALJ's determination on three grounds: (1) the ALJ erred

in finding Russell-Harvey's mental impairments as non-severe, (2) the ALJ improperly found

that the frequency, severity, and duration of Russell-Harvey's migraines was not

substantiated by the record, and (3) the ALJ committed reversible error by posing an

incomplete hypothetical question to the vocational expert.  For the reasons set forth below,

this case is remanded to the Commissioner for further proceedings.

## Statement of Relevant Facts

Russell-Harvey is 32 years of age, has obtained a GED, has a military service

record, and is able to read, write, speak and understand the English language. Tr.  32-33.

Russell-Harvey had past relevant work as a buffet attendant, a telemarketer, and an order

picker.  Tr. 50.  Russell-Harvey's work as a buffet attendant is classified as light, semi-

skilled work.  *Id.*  Her work as a telemarketer is classified as sedentary, semi-skilled, while

her work as an order picker is classified as medium, unskilled work.  *Id.*

### A.    Russell-Harvey's Mental Impairments

On December 14, 2010, Russell-Harvey was given a psychological evaluation by

Douglas R. Reed, MD, a psychologist at Diakon Family Life Services.  Tr. 348.  At that time,

Dr. Reed diagnosed Russell-Harvey with polysubstance dependence and a non-specific

3

mood disorder. Tr. 350. Dr. Reed opined that Russell-Harvey may suffer from bipolar II symptomology, but he was not certain at the time that she met the criteria for major depression, a key element in the diagnosis. *Id.*

The next month, Dr. Reed, together with a clinician and the clinical director at Diakon Family Life Services, signed off on a treatment plan for Russell-Harvey. Tr. 365-66. The treatment plan included two diagnoses; a definite diagnosis for bipolar II disorder, and a diagnosis for obsessive-compulsive disorder. Tr. 366.

### B.     Russell-Harvey's Migraines

The first references to Russell-Harvey's migraines contained within the administrative record date back to November 24, 2008.[3] Tr. 242. On that date, Russell-Harvey was examined by Abby Ezero, MD. *Id.* Dr. Ezero noted that drugs such as Atenolol had helped reduce the frequency of Russell-Harvey's migraines, but that the migraines had "increased in severity and length." *Id.* Dr. Ezero prescribed Lortab, Zomig, Phenergan, and Atenolol. *Id.*

On July 2, 2009, Russell-Harvey was examined by Bertha Gaytan, MD for complaints of a migraine that had lasted for two days. Tr. 237. Dr. Gaytan noted that, despite taking Excedrin Migraine and Imitrex to treat the migraine, Russell-Harvey still reported that her pain level was "10/10;" she was prescribed Lortab to help ease the pain.

---

[3] The administrative record indicates that Russell-Harvey's migraines began when she was sixteen years old after an automobile accident. Tr. 230. She also apparently had yearly MRIs in the seven years following this accident. Tr. 230, 269. However, no earlier medical records were included in the administrative record.

Tr. 237-38.  On July 31, 2009, Russell-Harvey visited Dr. Gaytan for a follow-up appointment.  Tr. 235.  At that appointment, Russell-Harvey reported that the July 2 migraine had lasted for about one week.  *Id.*  Russell-Harvey also stated that another migraine had begun on July 30, although the pain had dissipated somewhat.  *Id.*  Dr. Gaytan noted that the migraines worsened with noise and light, and gave Russell-Harvey prescriptions for Lortab and Treximet to treat the migraine.  Tr. 236.

On September 1, 2009, Russell-Harvey attended another follow-up appointment with Dr. Gaytan.  Tr. 233.  At this appointment, Russell-Harvey reported that she had been migraine-free for two weeks, and that she was "doing well" on Treximet.  *Id.*  She also reported that she was still getting headaches approximately two times per months.  Tr. 234.

On the evening of October 8, 2009, Russell-Harvey was admitted to the Susquehanna Health emergency room complaining of a headache.  Tr. 210-12.  Russell-Harvey was treated by Thomas Fiero, MD, who prescribed Vicodin, Ativan, Dilaudid, and Zafran for the migraine.  Tr. 212-15.  Dr. Fiero noted that this was Russell-Harvey's second migraine in the past three weeks, and that Russell-Harvey reported a pain level of ten out of ten.  *Id.*  Dr. Fiero ordered a computerized tomography ("CT") scan of Russell-Harvey's head; the CT scan presented no abnormal findings.  Tr. 219.

On October 16, 2009, Russell-Harvey was examined by Luan Pham, MD for worsening headaches.  Tr. 230.  Russell-Harvey reported that her migraine had begun on

October 12, and that Ativan and Vicodin had helped with the pain. *Id.* Dr. Pham prescribed Amitriptyline, Treximet, and Omerprazole. Tr. 232.

On November 9, 2009, Russell-Harvey was examined by Aaron Killpack, DO. Tr. 228. Russell-Harvey complained of a headache that had begun the day before, with a reported pain of seven out of ten. *Id.* She reported that Amitriptyline had made her headaches "bearable" and that Lortab also helped control her pain. *Id.* Dr. Killpack doubled Russell-Harvey's Amitriptyline doses and prescribed Maxalt and Fioricet. Tr. 229.

On November 20, 2009, Russell-Harvey was again brought to the emergency room complaining of headaches. Tr. 531. Russell-Harvey complained that her headache had begun twelve hours prior, and grew progressively worse. Tr. 538. Dr. Fiero prescribed Vicodin, Fioricet, Amitriptyline, Ativan, Zofran, Dilaudid, and Lortab . Tr. 533, 537. Later that afternoon when the headache had not abated, William Keenan, MD prescribed Axert, Maxalt, Treximet, and Omeprazole for Russell-Harvey. Tr. 245.

Three days later, on November 23, 2009, Russell-Harvey returned to the emergency room complaining of a continuing migraine and chest pain. Tr. 515, 524. Russell-Harvey reported to the physician on duty, Geralda Xavier, MD, that her migraine pain was a ten out of ten, and that her migraine medication was not working. Tr. 520, 527. Dr. Xavier prescribed Morphine, Toradol, and Dilaudid. Tr. 521.

On November 26, Russell-Harvey again returned to the emergency room, where she was examined by attending physician David Sole, DO. Tr. 252. Russell-Harvey stated that

6

she had been using her prescribed Vicodin and Ativan, but these drugs were not helping

with her headache. *Id.* She also reported severe pain, as well as numbness and weakness

in the left side of her body. Tr. 254. Dr. Sole noted that Russell-Harvey had access to

benzodiazepines and narcotics, and therefore he would not prescribe any additional

controlled substances for her. Tr. 252. However, Dr. Sole planned to attempt to relieve

Russell-Harvey's pain through an IV narcotic analgesia. *Id.* Dr. Sole provided Russell-

Harvey with Compazine, Dilaudid, Toradol, Compazine, and Benadryl through an IV. Tr.

255-56. Dr. Sole also ordered a CT scan, which revealed no abnormalities. Tr. 255. The

next day Russell-Harvey followed up with Shannon Hill, DO, complaining that her migraine

was ongoing. Tr. 276. Dr. Hill gave Russell-Harvey Lortab, Atenolol, Toradol, and

Phenergan in an attempt to end the migraine. Tr. 277.

On December 3, 2009, Russell-Harvey was brought to the emergency room after a

migraine led her to hyperventilate and pass out while at work. Tr. 274, 499, 510. Russell-

Harvey complained of a severe headache accompanied by vomiting and numbness, as well

as tingling in her hands and feet. Tr. 507. Russell-Harvey was given Benadryl, Phenergan,

and Toradol. Tr. 506. The following day, Russell-Harvey was examined by Thomas

Portuese, MD. Tr. 274. Dr. Portuese noted that the migraines had grown worse in recent

years, and that a headache diary revealed no clear triggers for the migraines. *Id.* Dr.

Portuese opined that Russell-Harvey's treatment plan was "failing," but avoided making any

adjustments to her medications until she could be examined by a neurologist. Tr. 275.

7

On December 10, 2009, Russell-Harvey had an initial consultation with Mitchell

Finch, MD, a neurological specialist.  Tr. 292.  Russell-Harvey reported that she usually had

two to three severe migraines per week, and three to four milder migraines in a month.  *Id.*

Dr. Finch noted that these headaches were associated with photophobia, phonophobia,

nausea, and vomiting.  *Id.*  Dr. Finch decided to leave Russell-Harvey on her medications,

but further prescribed Depakote[4] in an attempt to alleviate her migraines.  Tr. 293.

Six days later, on December 16, 2009, Russell-Harvey developed another migraine

and was examined by her primary care physician, Joseph Rabinowitz, MD.  Tr. 269.

Russell-Harvey reported that, despite two doses of medication, the migraine pain grew

progressively worse throughout the day.  *Id.*  Russell-Harvey reported numbness and

tingling on the left side of her body, and a throbbing headache with a pain intensity of ten

out of ten.  *Id.*  After concluding that Russell-Harvey "clearly ha[d] severe migraines," Dr.

Rabinowitz doubled her Axert dose, but maintained all other medications that had been

prescribed by Dr. Finch.  Tr. 270.

On January 21, 2010, Russell-Harvey had a follow-up examination with her

neurologist, Dr. Finch.  Tr. 291.  Russell-Harvey had a headache that day, but reported that

---

[4] The ALJ focused on Depakote as a medication that appeared to be effective in relieving Russell-Harvey's migraines.  Tr. 19.  However, the record does not support this broad conclusion.  While Russell-Harvey initially reported that Depakote reduced the severity, frequency, and length of her migraines, tr. 291, and once reported that she had not had a migraine in the roughly two week period since being prescribed Depakote, tr. 266, this relief was short-lived.  For example, on August 23, 2010, Dr. Stutzman noted that "[t]he preventative migraines medicines helped at first by decreasing the frequency of her episodes, however she has noticed no real difference as of late and no consistent effect on their severity."  Tr. 716.  In one of Russell-Harvey's most recent appointments, on March 9, 2011, Dr. Smigrodzki noted that she "was not responsive to outpatient medications including Depakote."  Tr. 382.

since beginning Depakote her headaches had decreased in severity, frequency, and length. *Id.* Despite her belief that Depakote was helping with her migraines, on January 25 Russell-Harvey presented herself to Dr. Rabinowitz, complaining of a migraine that had not abated for two days despite taking medication. Tr. 744. Russell-Harvey stated that Lortab gave enough relief to allow her to sleep, and that hydrocodone gave some relief; however, no other medications helped. *Id.* Russell-Harvey stated that her migraines usually lasted three to six days. *Id.* Dr. Finch conducted another follow-up examination of Russell-Harvey on February 23, 2010. Tr. 294. Russell-Harvey reported that she had stopped taking Depakote due to weight gain, but her headaches were not quite as severe as they had been previously. Tr. 295.

On February 27, 2010, Russell-Harvey again went to the emergency room due to headaches. Tr. 485. Russell-Harvey reported that her headache had been present for twenty hours, was accompanied by nausea and vomiting, and made her feel weak and dizzy. Tr. 488, 490. She was given Ativan, Toradol, Phenergan, and Lortab to treat the pain. Tr. 489. On March 3, 2010, when the migraine had not abated, Russell-Harvey presented herself to Dr. Rabinowitz for treatment. Tr. 738. Russell-Harvey stated that the emergency room treatment had not relieved her headache, although the Dilaudid had helped her sleep and the Lortab somewhat helped with the pain. *Id.* Russell-Harvey reported that she had several mild migraines within the past month, but that Axert had been effective in ending those migraines. *Id.* Dr. Rabinowitz observed that Russell-Harvey was

9

"clearly having a lot of pain during [the] 'migraine.'" Tr. 739.  Dr. Rabinowitz concluded that

he had "exhausted all of [his] treatment options," and thus sent Russell-Harvey to Dr. Finch

for examination. *Id.*

Dr. Finch concluded that Russell-Harvey was suffering from worsening headaches.

Tr. 585.  Since Axert was of no use in treating her migraine, Dr. Finch increased Russell-

Harvey's dose of Amitriptyline, renewed her prescription for Lortab, and started her on

Inderal. *Id.*

On March 5, 2010, Russell-Harvey again presented herself to the emergency room,

where she was examined by Dr. Xavier.  Tr. 474.  Russell-Harvey reported that the current

migraine was worse and lasted longer than previous migraines.  Tr. 478.  Russell-Harvey

complained that the headache had been progressively worsening since it had begun six

days prior.  Tr. 481.  Dr. Xavier treated her with Toradol, Compazine, Benadryl, and

Decadron.  Tr. 477.

Russell-Harvey visited Dr. Finch on March 31, 2010 for a follow-up appointment.  Tr.

584.  Russell-Harvey reported that overall her headaches were better since increasing the

Amitriptyline doses and starting Inderal. *Id.*  On April 30, 2010, Dr. Finch conducted another

follow-up examination of Russell-Harvey.  Tr. 583.  Russell-Harvey reported that a severe

headache had begun on April 29; in response, Dr. Finch increased her dosage of Inderal.

*Id.*

10

On May 17, 2010, Russell-Harvey was examined by Sarah McElroy, DO. Tr. 731.
Russell-Harvey reported that medication had lessened the pain intensity of her migraines,
but that she still suffered from a migraine every two to three weeks, and these migraines
usually lasted from two to seven days. *Id.* Russell-Harvey reported that her last migraine
had occurred two weeks prior to this appointment. *Id.* Dr. McElroy prescribed Propranolol,
Lortab, Flexeril, and Oxycodone. Tr. 732.

On June 1, 2010, Russell-Harvey presented to Dr. Finch with severe headaches
over the previous week and a half. Tr. 581. Russell-Harvey stated that she could not get
out of bed one morning due to a severe throbbing headache. *Id.* She also reported that
she was out of Lortab. *Id.* Dr. Finch prescribed more Lortab and increased her Propanolol
dose. Tr. 582.

On June 10, 2010, Russell-Harvey visited the emergency room complaining of a
severe migraine. Tr. 398, 401. Russell-Harvey reported that the migraine was
accompanied by nausea, vomiting, vision problems, and photophobia. Tr. 401. Russell-
Harvey was prescribed Ativan, Compazine, and Decadron. Tr. 409.

On August 3, 2010, Russell-Harvey again visited Dr. Finch with complaints of a
severe headache. Tr. 578. Dr. Finch gave Russell-Harvey a Dihydroergotamine Mesylate
("DHE") injection, but did not alter her preventative medications. Tr. 579. On August 25,
2010, Russell-Harvey returned to Dr. Finch with another migraine and was again treated
with a DHE injection. Tr. 576.

On October 26, 2010, Russell-Harvey was examined by Christina Burch, MD of the Susquehanna Health neurology department. Tr. 573. Russell-Harvey reported that her headache had been present for three days, and that she usually had headaches every two weeks. *Id.* Dr. Burch found that Russell-Harvey was positive for photophobia, but otherwise her neurological examination was normal. Tr. 574. Dr. Burch noted that Russell-Harvey was compliant with her medication, but the treatment was not working and needed to be altered. *Id.* Dr. Burch maintained Russell-Harvey's medications, but decided to taper down Amitriptyline and added Zonegran to the regimen. *Id.* Russell-Harvey attended a follow-up appointment with Dr. Burch on November 30, 2010. Tr. 570. Russell-Harvey reported no change in the frequency of her migraines. *Id.* Dr. Burch reiterated that Russell-Harvey was compliant with medication, but the current course of therapy needed alteration. Tr. 571. Dr. Burch increased the Russell-Harvey's Zonegran dose and switched her from Lortab to Fioricet. *Id.*

On January 28, 2011, Russell-Harvey was examined by Kussay Nassr[5] of the Susquehanna Health neurology department. Tr. 567. Though Russell-Harvey was suffering from a migraine, the report indicates the she was stable on multiple medications. Tr. 567-68. No alterations were made to Russell-Harvey's medications. Tr. 568.

On March 3, 2011, Russell-Harvey was examined in the Susquehanna Health neurology department by Rafal Smigrodski, MD. Tr. 564. Russell-Harvey complained of a

---

[5] The medical records do not clarify whether Kussay Nassr is a physician.

migraine that had begun the previous evening and was accompanied by nausea and blurry

vision. *Id.* Dr. Smigrodski suggested a regimen of DHE, Fioricet, Depakote, and Thorazine

to alleviate the pain. Tr. 565. Dr. Smigrodski also switched Russell-Harvey from Zonegran

to Topamax. *Id.*

On March 9, 2011, Russell-Harvey presented herself to the emergency room,

complaining of a migraine that had been present for the past week. Tr. 373. The migraine

caused her to vomit four times during the week, rendered her unable to sleep, and caused

lightheadedness and mild gait disturbances. *Id.* Russell-Harvey reported that Fioricet,

DHE, Topamax, Thorazine, and Depakote treatments were ineffective at easing her pain.

*Id.* After arriving at the emergency room, Russell-Harvey was given DHE, Reglan,

Topamax, Propanolol, Robaxin, and Thorazine. Tr. 374. Russell-Harvey reported that the

drugs did not ease her pain, although the physicians noted that "by our examination,

[Russell-Harvey] did not appear to be in any significant distress."[6] *Id.* Dr. Smigrodski noted

that the migraine was not responsive to outpatient medications, including Depakote. Tr.

382.

On March 16, 2011 Russell-Harvey was examined by Barbara Swartz, MD, of the

Susquehanna Health neurology department for treatment of a migraine that had continued

unabated for fourteen days. Tr. 561. Russell-Harvey reported that her migraine was

somewhat better, and Dr. Swartz noted that she did not appear to be in great pain. Tr. 561-

---

[6] In contrast, a nurse's note stated that Russell-Harvey appeared to be in pain. Tr. 384.

62. Dr. Swartz noted that Russell-Harvey had been compliant with medication and with her therapy. Tr. 562. At this appointment, Russell-Harvey agreed not to take Fiorinal "given propensity for tolerance." Tr. 561.

Finally, on March 31, 2011, Russell-Harvey had a hospital discharge follow-up appointment with Dr. Rabinowitz. Tr. 679. Dr. Rabinowitz noted that Russell-Harvey had two migraines since her hospital discharge on March 11. *Id.* Dr. Rabinowitz reduced the dose of Chlorpromazine, but otherwise left Russell-Harvey's medications intact. Tr. 670.

As part of her treatment plan, beginning on December 11, 2009, Russell-Harvey attended osteopathic manipulation[7] ("OM") sessions to treat her migraines, neck pain, and back pain. Tr. 262. These treatments generally occurred once every two to four weeks, with varying reports of effectiveness.[8] Russell-Harvey occasionally reported that her OM sessions were effective at reducing the frequency of her migraines. For example, on March 3, 2010, Russell-Harvey reported that OM "helped keep [her] migraines spaced out." Tr. 738. On July 23, 2010, Russell-Harvey further reported that OM sessions had "decreased [the] frequency of severe headaches." Tr. 723. However, Russell-Harvey also occasionally reported that OM sessions were not helping with her migraines, and were

---

[7] Osteopathic manipulation involves the application of manual pressure to the body to either relax the muscle tissue or engage the muscle tissue at its functional limit. Spine-health.com, Osteopathic Manipulative Treatment, *available at* http://www.spine-health.com/treatment/spine-specialists/osteopathic-manipulative-treatment-omt (last visited April 28, 2014).

[8] Russell-Harvey had OM treatments on December 11, 2009, January 11, 2010, March 1, 2010, March 8, 2010, March 23, 2010, May 18, 2010, June 23, 2010, July 23, 2010, August 18, 2010, September 9, 2010, October 22, 2010, November 9, 2010, November 19, 2010, January 14, 2011, February 2, 2011, February 17, 2011, March 8, 2011, and March 21, 2011. Tr. 262, 266, 682, 684, 690, 692, 700, 702, 705, 713, 718, 721, 723, 725, 729, 733, 735, 741.

occasionally responsible for triggering new migraines.  For example, on January 21, 2010, Russell-Harvey stated that her OM sessions "did not help."  Tr. 261.  On March 9, 2011, Russell-Harvey stated that she believed OM therapy may have worsened her head pain, tr. 373, and on March 16, 2011 Russell-Harvey reported that her last migraine had been triggered by OM therapy.  Tr. 561.

On April 2, 2010, Louis Bonita, MD examined Russell-Harvey and completed a residual functional capacity assessment.  Tr. 303.  Dr. Bonita opined that Russell-Harvey could occasionally lift fifty pounds and frequently lift twenty-five pounds.  Tr. 304.  Dr. Bonita believed that Russell-Harvey should never climb ropes or scaffolds, could occasionally climb ladders, and could frequently use ramps and stairs.  Tr. 305.  Dr. Bonita also opined that Russell-Harvey should avoid concentrated exposure to noise, vibration, and hazards. Tr. 306.  Otherwise, Dr. Bonita believed that Russell-Harvey had no work-related limitations imposed by her medically determinable impairments.  Tr. 303-06.

### C.    The Administrative Hearing

On May 4, 2011, Russell-Harvey's administrative hearing was conducted.  Tr. 27-54. At the hearing, Russell-Harvey admitted that she was receiving unemployment compensation.  Tr. 36.  Russell-Harvey testified that she sometimes had troubling lifting objects, and that her hands and fingers would occasionally go numb, at which point she would drop anything in her hands.  Tr. 39.  Russell-Harvey stated that her medications helped her slightly.  Tr. 41.  Russell-Harvey also testified that she could do much of her

personal care herself, but that she occasionally needed help bathing and doing household chores and once or twice a month she required help dressing herself and doing her hair.  Tr. 37, 43.  She also required help brushing her teeth and putting on her shoes.  Tr. 43-44. Russell-Harvey also testified that she would go grocery shopping once a month, and go fishing once or twice a month.  Tr. 44.  Russell-Harvey testified that she would get bad migraines one to three times per month, with each migraine lasting anywhere from three days to three weeks; when these migraines struck, she could not do any household chores. Tr. 48.

After Russell-Harvey testified, Mateen Henseys, an impartial vocational expert, was called to give testimony.  Tr. 50.  The ALJ asked the vocational expert to assume a hypothetical individual with Russell-Harvey's age, education, and work experience who was able to work at any exertional level, but was limited to occasional climbing and balancing, and could never climb or balance on a ladder.  Tr. 50-51.  Furthermore, the hypothetical individual needed to avoid noise and vibration and hazards such as heights and moving machinery, and had a bilateral overheard reach limitation.  Tr. 51.  The ALJ further proposed that this hypothetical individual was limited to simple, routine tasks and low stress, with only occasional decision making required and only occasional changes in the work setting, and this individual should not interact with the public.  *Id.*

The vocational expert first opined that this hypothetical individual would be unable to perform any of Russell-Harvey's past relevant employment.  *Id.*  However, the vocational

16

expert testified that this individual would be capable of performing three other jobs that exist

in significant numbers in the regional economy: a trimmer, a machine operator, and a

tagger. *Id.*

The ALJ then modified the hypothetical question. The ALJ added that the individual

may require breaks in excess of the normal two breaks per day plus lunch, and may require

unscheduled breaks throughout the day of varying lengths. Tr. 52. The ALJ added that this

individual may be expected to miss more than three days of work per month, and may be

expected to be off task for thirty percent of the day. *Id.* The vocational expert testified that,

under these circumstances, the hypothetical individual would not be able to perform any

work in the regional or national economy. *Id.*

## Discussion

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision

denying a plaintiff's claim for disability benefits, the district court must uphold the findings of

the Commissioner so long as those findings are supported by substantial evidence.

Substantial evidence "does not mean a large or considerable amount of evidence, but

'rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), quoting *Consolidated Edison

Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence has been described as

more than a mere scintilla of evidence but less than a preponderance. *Brown v. Bowen*,

845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed factual record substantial

evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. *See* 20 C.F.R. § 404.1520; *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,

18

(4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. *See* 20 C.F.R. § 404.1520. The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason*, 994 F.2d at 1064.

### A.     Step One

The ALJ at step one of the sequential evaluation process found that Russell-Harvey had not engaged in substantial gainful work activity since October 1, 2009, the date of Russell-Harvey's application for benefits. Tr. 15. No error is alleged here.

### B.     Step Two

At step two of the sequential evaluation process, the ALJ found that Russell-Harvey only suffered from one severe impairment, migraines. Tr. 16. The ALJ further determined that Russell-Harvey suffered from several non-severe impairments, including mood disorder, polysubstance abuse, status post nodal marginal zone lymphoma, status post right radical vulvectomy, and a wide local excision of the right vulva. Tr. 16-17. Russell-Harvey contends that the ALJ committed reversible error by finding her mental impairments to be non-severe.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments at step two and then, when setting a claimant's residual functional capacity, considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529.  The determination of whether a claimant has any severe impairment at step two of the sequential evaluation process is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. *Id.*

If a claimant has any severe impairment, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two. *See, Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  However, all of the medically determinable impairments both severe and non-severe must be considered at step two and then at step four when setting the residual functional capacity. The social security regulations mandate such consideration and this court has repeatedly so indicated. *See, e.g., Shannon v. Astrue*, 4:11-CV-00289, 2012 WL 1205816, at *10 (M.D.Pa. April 11, 2012)(Rambo, J.); *Bell v. Colvin*, 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D.Pa. Dec. 23, 2013)(Nealon, J.); *Stape v. Colvin*, Civil No. 3:13-CV-02308, 2014 WL 1452977, at *6 (M.D.Pa. April 14, 2014)(Brann, J.); 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

At step two of the sequential evaluation process, the ALJ found that Russell-Harvey did suffer from a severe impairment. Tr. 16. However, the ALJ did not consider Russell-Harvey's diagnosis of obsessive-compulsive disorder. The ALJ noted a December 2010 examination by Dr. Reed, and Dr. Reed's diagnosis of a non-specific mood disorder. Tr. 16. However, the ALJ failed to address a January 2011 treatment plan, signed by Dr. Reed, containing a diagnosis of bipolar II disorder and obsessive-compulsive disorder. Tr. 365-66. The ALJ fails entirely to mention any diagnosis of obsessive-compulsive disorder, and limited her analysis only to a mood disorder. Tr. 16. While bipolar II disorder is a mood disorder, obsessive-compulsive disorder is classified as an anxiety disorder. *See, Diagnostic and Statistical Manual of Mental Disorder* 392, 456 (4th ed. Text rev. 2000).

The failure of the ALJ to find obsessive-compulsive disorder as a medically determinable impairment, or to give an adequate explanation for discounting it, makes the ALJ's decisions at steps two and four of the sequential evaluation process defective. The error at step two of the sequential evaluation process draws into question the ALJ's residual functional capacity assessment and the assessment of Russell-Harvey's credibility. The ALJ found that Russell-Harvey's medically determinable impairments could reasonably cause her alleged symptoms but that her statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. Tr. 19. This determination by the ALJ was based on an incomplete and faulty analysis of all of Russell-Harvey's medically

determinable impairments. Therefore, on remand, the ALJ must properly address Russell-Harvey's allegations of obsessive-compulsive disorder.

### C.    Step Three

At step three, the ALJ concluded that Russell-Harvey did not suffer from an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 18. Russell-Harvey does not allege error with this finding.

### D.    Step Four

At step four of sequential evaluation process, the ALJ found that Russell-Harvey maintained the residual functional capacity to perform a full range of work at any exertional level. Tr. 18. The ALJ found that Russell-Harvey was limited in performing work inasmuch as she was not able to work at unprotected heights or around moving machinery, and must avoid noise and vibration. *Id.* The ALJ further found that Russell-Harvey could only occasionally climb and balance, but could never do so on ladders. *Id.* Additionally, the ALJ found that Russell-Harvey had a bilateral overhead reach limitation. *Id.* Finally, the ALJ found that Russell-Harvey was limited to working jobs with simple, routine tasks and low stress, and that any job should involve only simple work place judgments, and should involve only occasional changes in the work setting, and no interaction with the public. *Id.*

The ALJ posed a hypothetical question to the vocational expert that accurately depicted these limitations. Tr. 51. Based on this hypothetical question, the vocational expert testified that such a hypothetical individual would be unable to return to Russell-

22

Harvey's previous work, but could perform other jobs that exist in sufficient numbers in the regional economy. *Id.* However, in arriving at the aforementioned residual functional capacity, the ALJ committed several errors. In addition to the error noted in step two, the ALJ failed to resolve conflicting evidence, inappropriately discounted Russell-Harvey's credibility, and reached a decision regarding Russell-Harvey's residual functional capacity without the benefit of a physician assessment.

i.     Failure to Resolve Conflicting Evidence

The ALJ, in assessing Russell-Harvey's residual functional capacity, found that the treatment records did not substantiate the alleged frequency, severity, or duration of Russell-Harvey's migraines. Tr. 19. In reaching this conclusion, the ALJ found that (1) Depakote had been effective in treating Russell-Harvey's migraines, (2) OM therapy had reduced the frequency of Russell-Harvey's migraines, and (3) Russell-Harvey's treatment records, "when viewed longitudinally," did not "support disabling symptoms." Tr. 19-20. These findings are contradicted by evidence contained within the administrative record, evidence that was not addressed or was rejected with inadequate explanation.

In reaching a decision, an ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 (3d Cir. 2008). In the "not uncommon situation of conflicting medical evidence[,] [t]he trier of fact has the duty to resolve that conflict." *Richardson v. Perales*, 402 U.S. 389, 399 (1971). The United States Court of Appeals for

23

the Third Circuit "has recognized that there is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981).

The ALJ cited to two medical reports as evidence that Depakote was effective in limiting Russell-Harvey's migraines. Tr. 19. The first medical report, from Dr. McElroy, was completed on January 11, 2010. Tr. 266. In that report, Dr. McElroy noted that Russell-Harvey had not suffered from a migraine since she had first been prescribed Depakote two weeks earlier. *Id.* The second report that the ALJ relied on was dated January 21, 2010, wherein Dr. Finch noted that Depakote reduced the severity, frequency, and length of Russell-Harvey's migraines. Tr. 291. However, the ALJ failed to address evidence that indicated Depakote was not effective in treating Russell-Harvey's migraines. For example, on August 23, 2010, Dr. Stutzman noted that "[t]he preventative migraine medicines helped at first by decreasing the frequency of her episodes, however she has noticed no real difference as of late and no consistent effect on their severity." Tr. 716. On March 9, 2011, Dr. Smigrodzki noted that Russell-Harvey "was not responsive to outpatient medications including Depakote." Tr. 382. The ALJ failed entirely to address this evidence and resolve the conflict is created with the evidence that the ALJ did cite to.

The ALJ also noted that several reports indicated that Russell-Harvey received an overall benefit from OM therapy, and that such therapy decreased the frequency of her migraines. Tr. 19-20. The ALJ did acknowledge that OM therapy triggered at least one

24

migraine.  Tr. 20.  However, the ALJ did not address other medical reports that indicated the

OM therapy was of little or no help in reducing the frequency or severity of Russell-Harvey's

migraines.  Tr. 261, 373.

Finally, the ALJ stated in conclusory fashion that, while Russell-Harvey did complain

of intractable headaches throughout 2010 and into 2011, "when viewed longitudinally, these

records do not support disabling symptoms."  Tr. 20.  The ALJ failed to cite to or address

medical evidence in reaching this conclusion.  The ALJ ignored the voluminous medical

reports and records outlined above, including twenty-six medical appointments related to

migraines and nine emergency room visits due to migraines over an approximately twenty-

month period.  The ALJ may well have found certain evidence within the record persuasive

in determining that the medical records did not support Russell-Harvey's allegations, but

without mention of any evidence whatsoever, it is impossible to say that this conclusion is

support by substantial evidence.

Without an assessment of the conflicting evidence cited to above, it is impossible to

determine whether the reasons for the rejection of this evidence were improper, or whether

the evidence was considered at all. *Cotter*, 642 F.2d at 707.  This makes meaningful review

of the ALJ's decision on these points impossible.  Consequently, on remand the ALJ must

address and properly resolve the conflicts created by the probative evidence contained

within the administrative record.

ii.     Improper Determination of Russell-Harvey's Credibility

The ALJ found that Russell-Harvey was less than credible based on "evidence" of

drug-seeking behavior and Russell-Harvey's continuing receipt of unemployment

compensation. Tr. 20. The ALJ stated that Russell-Harvey requested narcotic medications

during emergency room visit "after her physicians had recommended against these

medications." *Id*. The ALJ concluded that "evidence suggests [Russell-Harvey's subjective

reports] may have been made secondary to drug-seeking behavior." *Id*.

An ALJ's credibility determination is entitled to great deference by the district court.

*Refer v. Barnhart*, 326 F.3d 876, 380 (3d Cir. 2003). However, the ALJ's credibility

determination must "contain specific reasons for the finding on credibility, supported by the

evidence in the case record[.]" SSR 96-7p at *2 (1996). Evidence of drug seeking behavior

may be considered in evaluating a claimant's credibility. *E.g.*, *Toland v. Colvin*, 02:12-CV-

01663, 2013 WL 6175817 (W.D. Pa. Nov. 25, 2013) (citation omitted). An ALJ may also

properly use the receipt of employment benefits as a factor affecting a claimant's credibility.

*Myers v. Barnhart*, 57 Fed. App'x 990, 997 (3d Cir. 2003). However, the receipt of

employment benefits may not, on its own, be a dispositive factor in assessing a claimant's

credibility. *See, e.g.*, *Aldrich v. Colvin*, 3:13-CV-1292, 2014 WL 888507, at *13 (M.D. Pa.

Mar. 6, 2014); *Root v. Colvin*, 1:13-CV-00655, 2014 WL 1293833, at n. 7 (M.D. Pa. Mar. 31,

2014).

Here, while the ALJ based her credibility determination in large part on a belief that Russell-Harvey engaged in drug-seeking behavior, the administrative record is entirely devoid of any evidence of such behavior. No doctor ever mentioned any suspicion that Russell-Harvey was lying or exaggerating her symptoms to receive narcotic drugs. No doctor ever stated that Russell-Harvey was running out of her prescription medication sooner than she should have. In fact, multiple doctors noted that Russell-Harvey was compliant with her medication and treatment plan. Tr. 515, 561, 570, 573. There is no record that Russell-Harvey ever directly requested a narcotic medication. The ALJ asserted that Russell-Harvey had requested medication narcotic medications during visits to the emergency room, even though her physicians made previously recommended against the use of these medications. Tr. 20. A thorough review of the administrative record does not reveal a single instance of this occurring. During one visit to the emergency room, Dr. Sole stated that he would not prescribe any additional controlled substances[9] to Russell-Harvey. Tr. 252. However, Dr. Sole's stated reason for this was because Russell-Harvey already had access to benzodiazepines and narcotics. *Id.* The administrative record only establishes two instances of Russell-Harvey directly requesting medication; neither request was for a narcotic medication, and both medications had been recommended to Russell-Harvey by a physician. Tr. 561, 716.

---

[9] Controlled substance does not necessarily mean a narcotic substance. Thus, if this is the instance that ALJ was referring to, it provides little support for the ALJ's determination.

The administrative record as a whole belies the ALJ's determination that Russell-Harvey engaged in drug-seeking behavior, and therefore it was improper for the ALJ to use this as grounds to discount Russell-Harvey's credibility. That leaves Russell-Harvey's receipt of unemployment benefits as the only proper grounds that the ALJ used to evaluate and reject Russell-Harvey's credibility. The receipt of unemployment benefits alone cannot be a dispositive factor in assessing Russell-Harvey's credibility, and therefore the ALJ's determination that Russell-Harvey was not credible is not supported by substantial evidence.

iii.     Absence of a Physician Assessment to Support the ALJ's Residual Functional Capacity Determination

Finally, the ALJ's residual functional capacity determination is flawed as a whole because it is based on the ALJ's lay opinion, rather than medical evidence. A residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. *See Burnett v. Comm'r of Soc. Sec. Admin.,* 220 F.3d 112, 121-122 (3d Cir 2000). Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. *See Doak v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986)("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. §

404.1545(a). "Federal courts have repeatedly held that an ALJ cannot speculate as to a Plaintiff's RFC; medical evidence speaking to a claimant's functional capabilities that supports the ALJ's conclusion must be invoked." *Biller v. Acting Comm'r of Soc. Sec.*, 962 F.Supp.2d 761, 779 (W.D. Pa. 2013) (citations omitted).

Dr. Bonita, a state agency medical consultant, was the only doctor in the administrative record to offer an assessment of Russell-Harvey's physical residual functional capacity. Tr. 20. The ALJ rejected Dr. Bonita's opinion as "simply not supported by the medical evidence of record or the record as a whole." *Id*. Without any medical opinion or assessment to support the ALJ's residual functional capacity determination, the ALJ's assessment was flawed. In light of the ALJ's decision to reject the only available residual functional capacity assessment offered by a doctor, on remand the Commissioner should elicit additional medical opinion regarding Russell-Harvey's residual functional capacity.

## E.     Step Five

At step five, the ALJ concluded that, given Russell-Harvey's residual functional capacity, she was capable of performing three jobs that exist in significant numbers in the national economy. Tr. 21. In making this determination, the ALJ posed a hypothetical question to a vocational expert that reflected the ALJ's flawed residual functional capacity assessment. Tr. 50-51. The vocational expert testified that under the circumstances

presented in the hypothetical question, the individual would be able to perform three jobs that exist in significant numbers in the national economy. Tr. 51.

As the residual functional capacity used by the ALJ was flawed, the hypothetical question posed by the ALJ did not accurately reflect Russell-Harvey's actual ability to work. Therefore, the ALJ's determination that Russell-Harvey could perform jobs that exist in a significant number in the national economy is not supported by substantial evidence.

**Conclusion**

A review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order will be entered.

BY THE COURT:

Robert D. Mariani
United States District Judge

Dated: May 29 , 2014